**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **BOARD OF TRUSTEES,** | ) | |
| **SHEET METAL WORKERS'** | ) | |
| **NATIONAL PENSION FUND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 1:09cv511(LO/IDD)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **STEPHEN HAWLEY d/b/a HAWLEY** | ) | |
| **SERVICES** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, STEPHEN HAWLEY d/b/a HAWLEY SERVICES, by his undersigned counsel, submits his Memorandum of Law in Support of Motion for Summary Judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Joint Stipulation of Uncontested Facts ("JSUF") Filed January 27, 2010

Plaintiff to this action is the Board of Trustees, Sheet Metal Workers' National Pension Fund. (JSUF ¶ 1). The Fund is created and maintained pursuant to § 302(c) of the LMRA, 29 U.S.C. § 186(c), and is a multiemployer pension plan within the meaning of § 3(37) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1002(37). (¶ 2). Plaintiff is comprised of individual trustees who are "fiduciaries" with respect to the Funds, as defined in § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and are collectively the "plan sponsor" within the meaning of 4001(a)(10)(A) of ERISA, 29 U.S.C. § 1301(a)(10)(A). (¶ 3). Plaintiff is authorized to bring this action on behalf of the Fund, its participants, and beneficiaries pursuant to § 502(a)(3), 29 U.S.C. § 1132(a)(3). (¶ 4).

Defendant was party to two collective bargaining agreements ("CBAs") with Local Union No. 1, from July 2004 though September 30, 2008. (¶ 6)  The first CBA, which was effective from May 1, 2002 through April 30, 2007 ("2002 CBA"), was signed by Defendant on July 22, 2004. (¶ 7). Defendant also was a party to a successor CBA effective May 1, 2007 ("2007 CBA").  (¶ 8). Defendant was an owner/member of the sole proprietorship called Hawley Services, and Defendant did not employ any individuals other than himself.  (¶ 9).  Article VIII, § 14 of the 2002 and 2007 CBAs states as follows:

> The parties agree to be bound by the separate Agreements and Declarations of Trusts establishing the International Training Institute for the Sheet Metal and Air Conditioning Industry, the National Energy and Management Institute Committee, the Sheet Metal Occupational Health Institute Trust, and the Industry Fund of the United States and the separate agreements and declarations of trusts of all other local and national programs to which it has agreed that contributions will be made. In addition, the parties agree to be bound by any amendments to said trust agreements as may be made from time to time and hereby designate as their representatives on the Board of Trustees such trustees as are named together with any successors who may be appointed pursuant to said agreements.  (¶ 10)

Under the terms of both the 2002 and 2007 CBAs, Defendant made contributions to the Plaintiff Pension Fund; contributions to the pension fund are required on pages in Section 26 to the Addendum to each CBA.  (¶ 11)

The basis for Plaintiff's claim is that the provisions of the Trust Agreement related to the Exit Contribution are set out in Article VI of the Trust Agreement document (¶ 12), which, if applicable, Defendant stipulates state:

**ARTICLE VI. EXIT CONTRIBUTION**
**Section l.        Imposition of Exit Contribution**
The Trustees may, in their sole and absolute discretion, impose an "Exit Contribution" (as determined below) on any Employer who has a "Triggering Event" on or after January 1, 2003.  While the actual cost of a Triggering Event cannot be precisely determined, the Exit Contribution is designed to cover the addition costs incurred by the Fund as a result of a Triggering Event.  Each Employer agrees to pay an Exit Contribution by continuing to contribute, or being obligated to contribute, to the Fund on and after the effective date of this Article.

**Section 2.          Triggering Event Defined**

For purposes of this Article VI, a "Triggering Event" occurs when an Employer's Contribution Rate significant decline (as determined by the Trustees) or the Employer ceases to have an obligation to contribute to the Fund on some or all of its Employees, but is not required to pay any withdrawal liability to the Fund under Title IV of ERISA as a result thereof.

**Section 3.          Determination of the Exit Contribution**

The amount of an Employer's Exit Contribution is equal to the contributions due for the thirty-six months, preceding the month in which the Triggering Even occurs The Exit Contribution shall be paid to the Fund no later than the 20th of the month following the month in which the Triggering Event occurs or if later, by the 20th of the month following the month in which the Fund makes an Exit Contribution assessment.

**Section 4.          Treatment of an Exit Contribution**

The Exit Contribution is a Contribution for purposes of the Fund's governing documents, including, but not limited to, Article IV of this Agreement and Declaration of Trust, as amended, and an Employer's failure to make an Exit Contribution constitutes a delinquency under the terms of the Fund's governing documents and will be treated in the same manner as other delinquent Contributions.

In September 2008, Defendant ceased doing business as Hawley Services, and, on October 20, 2008, Defendant withdrew his membership in Local 1. (¶ 13). The Fund has determined that on or about October 1, 2008, Defendant permanently ceased to have an obligation to contribute monthly contributions to the Fund, thereby withdrawing from the Fund in a statutory "complete withdrawal" as defined in § 4203 of ERISA, 29 U.S.C. § 1383. (¶ 14). Defendant's withdrawal from the Fund prompted the Fund to make a determination of whether Defendant should be assessed with withdrawal liability. (¶ 15). The Fund determined that Defendant did not owe withdrawal liability; the Fund determined that Defendant incurred an Exit Contribution to the Fund in the amount of $27,485.60. (¶ 16). On or about February 9, 2009, Defendant received a Notice and Demand for payment of Exit Contribution issued by the Fund; this Notice and Demand for payment notified Defendant that its Exit Contribution was $27,485.60 and that this amount was to be paid within 20 days of the letter. (¶ 17). Defendant has not made any Exit Contribution payments to the Fund. (¶ 18).

<u>Defendant's Statement of Additional Undisputed Facts</u>

1.     At no time in his dealings with the Union or discussions about joining or signing a CBA was it ever mentioned to Defendant that there was even a concept known as Exit Contributions or that if he ever withdrew from the Union that he could be assessed such a "contribution" even if or specifically because he was found to owe no withdrawal liability to the Pension Fund.  (Def. Aff. ¶ 3).

2.     Defendant had never even seen, until the discovery process in this litigation, when a copy was actually produced to his attorney, a copy of any trust document purporting to bind him to make an Exit Contribution if he withdrew from the Union and no withdrawal liability was assessed against him; Defendant never signed or read such a document nor had one been presented to him.  (*Id.* ¶ *4).

3.     Defendant did not agree to the language of such a trust document purporting to make him responsible for any such Exit Contribution, nor to any document establishing that he ever read, possessed, had provided to him or even saw such document prior to discovery in this case.  *Id.*

4.     Defendant never even saw the "Sheet Metal Workers' National Pension Fund Amended and Restated Agreement and Declaration of Trust as Amended through June 1, 2003" document before the date when it was shown to him after being produced to his counsel. (*Id.* ¶ *5).

5.     Only since this case was filed does Defendant know that Plaintiff contends he signed CBAs that had language in one or both of them that bound him to language of the Trust Agreement about Exit Contributions.  (*Id.* ¶ *6).

6. The two CBAs set forth in Sections 12 and 14 of Article VIII that certain contributions were to be made to various entities, and Section 12 (b) states that a payment is to be made to the "Sheet Metal and Air Conditioning Contractors' National Industry Fund of the United States (IFUS)." (*Id. ¶ 7*).

7. Section 14 specifies three other payments, one each for the "International Training Institute for the Sheet Metal and Air Conditioning Industry," the "National Energy Management Institute Committee," and the "Sheet Metal Occupational Health Institute Trust," and, as to the latter two of these, the payments are to be made to the "Sheet Metal Workers' National Benefit Fund, Washington D.C." *Id.*

8. Right after these paragraphs of Section 14, there is the language quoted in the middle of page 2 above; the referenced portions of the CBAs are attached to this Memorandum as Exhibit 1. (*Id. ¶ 8*).

9. Even looking at this document now, Defendant has no idea what "the Industry Fund of the United States" means. (*Id. ¶ 9*).

10. The Trust Agreement draws a distinction between the three entities to which payments are due in paragraph 14 and the payment to IFUS in paragraph 12, and it also even appears to distinguish between the "IFUS" and the "Industry Fund of the United States." (*Id. ¶ 9*).

11. The drafters of the document referred to IFUS in four places, but in their language purporting to bind Defendant to declarations of trusts of various entities the "IFUS" acronym is not used. (*Id. ¶ 9*).

12. The only document actually received in discovery that mentions Exit Contribution liability is the "Sheet Metal Workers' National Pension Fund Amended and Restated Agreement

and Declaration of Trust as Amended through June 1, 2003," and that document does not have the same name as any of the references in Sections 12 and 14 of the CBA.  (*Id. ¶ 9).*

13.     The "Trust Agreement" only permits the trustees to impose an Exit Contribution on an "Employer," and Article 1, Section 6 (page 2) defines an "employer" to mean one which has a CBA "with the Union requiring periodic Contributions …." *(Id. ¶ 10).* See Exhibit 2 to this Memorandum.

14.     The Sheet Metal Workers' National Pension Fund Plan Document ("Plan") in Section 1.10 (a) (1) defines "employer" in the same way.  Subsection (a) (2) of Section 1.10 also requires, for one to be an "employer," that it be "participating in the Plan in accordance with the provisions of Article 2."  (*Id. ¶ 10).*

15.     Section 2.04, which is a part of Article 2, states that termination of an employer's status is governed by Article 12 of the Plan Document.  (*Id. ¶ 10).*

16.     Section 12.01 of Article 12 states: "This Article sets forth the basis for terminating an Employer's participation in the Plan ….  In no event shall the termination of any Employer under this Article 12 result in an impermissible reduction or forfeiture of Accrued Benefit under Section 411 of the Code or 204 of ERISA …." *(Id. ¶ 11).*

17.     One part of Article 12 is Section 12.04, entitled "Withdrawal of Employer," which provides in pertinent part: "Notwithstanding any other provision to the contrary, an Employer's status as a Contributing Employer shall automatically terminate whenever the Employer has a complete withdrawal ….  When an Employer has a complete … withdrawal, the Employer shall be liable to the Plan for the amount of withdrawal liability determined under Title IV, Subtitle E, Part 1 of ERISA, subject to the terms and conditions set forth in the document that is approved by the Trustees and that specifies the procedure for determining such

withdrawal liability ….” Copies of the cited pages of the Plan Document are attached as Exhibit 3 to this Memorandum.  *(Id. ¶ 11)*.

18.     Defendant was the subject of a Compliance Audit for Plaintiff’s Pension Fund, with Alex Dyer of Plaintiff’s Audit Department writing to demand payment of $852, plus added fees, by October 15, 2008, which Defendant paid.  *(Id. ¶ 12)*.

19.     On September 26, 2008, Defendant met with Bill Comstock, the Local Union 1 business agent, to discuss shutting down Defendant’s sole proprietorship because he had been working alone, had never hired any employees, and desired to sign up with Local 353 of the Steamfitters to do the work he was now performing and wanted to do.  *(Id. ¶ 13)*.

20.     Comstock told Defendant to send out a letter to inform the funds and on or about September 26, 2008, Defendant communicated that he was withdrawing from the Sheet Metal Workers.  *(Id. ¶ 14)*.

21.     On October 7, 2008, Tina Woodburn of Plaintiff’s Pension Fund wrote Defendant, indicating that the Pension Fund had been advised that Hawley Services had ceased contributing to the Fund and asked him to complete a questionnaire; the Woodburn letter discussed the concept of withdrawal liability but made no mention of any possibility of being assessed an Exit Contribution.  *(Id. ¶ 14)*.

22.     On October 16, 2008, Defendant incorporated Hawley Mechanical Inc., an Illinois corporation; it was assigned its own Employer Identification Number. *(Id. ¶ 15)*.

23.     Defendant also received a Sheet Metal Worker’s International Association Building Trade Withdrawal card dated October 20, 2008, and on October 24, 2008, Hawley Mechanical Inc. entered into a union agreement with Steamfitters Local #353.  *Id.*

24.     Defendant provided the requested information on the questionnaire, and Plaintiff determined that there had been a complete withdrawal and that Defendant had permanently ceased to have an obligation to contribute monthly to the Fund. *(Id. ¶ 16)*.

25.     Defendant's son-in-law, Jeremy Balzell, started doing business on August 21, 2007, as "Mt.  Hawley Mechanical," with his own Employer Identification Number.  *(Id. ¶ 18)*.

26.     On December 22, 2008, Prairie Contractors, Inc. entered into a written contract with Balzell d/b/a "Mt.  Hawley Mechanical" for work at a McDonald's Restaurant in North Pekin, Illinois.  *Id.*

27.      On December 30, 2008, Comstock arrived on the North Pekin McDonald's job site. *Id.*

28.     Defendant agreed with Balzell to do very limited work on the site reclaiming an ice machine, which was all steamfitters work, not sheet metal. *(Id ¶ 19)*.

29.      After withdrawing from Local Union 1 of the Sheet Metal Workers, Defendant did not perform any covered sheet metal work for anyone at any location.  *Id.*

30.     Neither Defendant nor Balzell has ever had any interest in each others' businesses, and they were always separate with separate tax numbers.  *Id.*

31.     Comstock wrote a January 10, 2009 letter to the Pension Fund, stating that Defendant had done sheet metal work at McDonald's despite withdrawing from Local 1 to do steamfitter work. *(Id. ¶ 20)*.

32.     Comstock went so far as to file a Sheet Metal Industry Grievance on January 12, 2009, which was never pursued; the contention was that sheet metal work was being performed on a non-union basis.  *(Id. ¶ 21)*.

33.     On February 3, 2009, Defendant went to see Comstock on his request to clear up the situation in a good faith effort to resolve the controversy caused by the mistaken impression about the McDonald's job site.  *Id.*

34.     At that meeting, Defendant provided Comstock a copy of the contracts for the McDonald's job between the general contractor, Prairie Contractors, and Mt.  Hawley Mechanical, Balzell's business, and also demonstrated to Comstock that he had been hired to remove refrigerant from a cooler and ice machine, as he was entitled to do for Mt.  Hawley Mechanical Inc., a signatory to the Local 353 Steamfitters Union to which he belonged.  *Id.*

35.     Comstock seemed satisfied with the information presented by Defendant.  *Id.*

36.     Nevertheless, the next day, February 4, 2009, Dyer on behalf of the Pension Fund wrote Defendant indicating there had been a triggering event and Exit Contributions were due and owing. *(Id. ¶ 23).*

37.     In a letter dated February 11, 2009, to Dyer from Jonathan Hawley, another attempt was made to set the record straight. *Id.*

38.     Balzell was the sheet metal sub-contractor on the McDonald's job, and he further subcontracted out the fitter work to Defendant.  *(Id. ¶24).*

39.     Comstock's impression that Defendant was performing sheet metal work at this location on a non-union basis was untrue, but even with correct information he never relented. *Id.*

40.     Dyer admitted to Defendant that the only reason the letter of February 4, 2009 was written was because of what Comstock had said in his communication to the Pension Fund. *(Id. ¶ 25).*

41.     Dyer also told Defendant in that same telephone conversation that if he could get the Local Business Agent (Comstock) to send a letter stating that he was not performing sheet metal work, he would not assess any Exit Contributions.  *Id.*

42.     Dyer told Defendant he would send a copy of the Comstock letter to him, and he did. *Id.*

43.     Marc Rifkind, one of the attorneys representing Plaintiff in this case, wrote Jonathan Hawley on March 9, 2009 stating:  "The facts you provided in your letter to Alex Dyer confirm that Steven W.  Hawley d/b/a Hawley Services is liable for Exit Contributions since he continued to perform the type of work, sub-contracted that work, which he was performing when he participated in the Fund."  (*Id. ¶ 26*).

44.     All of the material regarding the McDonald's job, Balzell, Comstock and the contents of paragraphs 18-27 of Defendant's Affidavit, in addition to his position that he does not owe an Exit Contribution, was sent to Plaintiff's counsel by defense counsel on June 12, 2009, in an attempt to get the Fund to drop this suit.  *(Id. ¶ 28)*.

45.     In the northern part of Peoria Illinois, there is an area referred to as Mount Hawley, an airport, country club and numerous businesses use "Mt.  Hawley" in their name, and Defendant just happens to have a last name (Hawley) that is the same as the second part of the name of this area of Peoria, as explained to Plaintiff by Defendant's representative. (*Id. ¶ 29; Jonathan Hawley Affidavit ¶ 10 and Tab A thereto*).

46.     "Steven Hawley d/b/a Hawley Services" was only in the Union and a participant in the Pension Fund for a little over four years, but the Fund is seeking back contributions Defendant made for three full years, plus liquidated damages and interest and fees.  (*Id ¶ 30*).

47.     Jonathan Hawley and Jeremy Balzell's affidavits, filed herewith, corroborate the testimony set forth in Defendant's affidavit and authenticate certain documents submitted with Defendant's affidavit.

### Deposition Testimony of Plaintiff's Representative Alex Dyer

Q.      …Does this Exit Contribution liability have anything to do with whether the guy stops doing the work and then he's caught doing the type of work that he was doing before under the collective bargaining agreement, as far as you know?

A.      That would be considered a triggering event.

Q.      What's the triggering event, the withdrawing or doing the work that you were doing before you withdrew and getting caught doing it?

 A.      Actually the continuance.

Q.      … So let's just apply this to Hawley's situation.   [L]et's just assume Hawley had been with the Sheet Metal Workers and he decides, Hey, I'm not really doing sheet metal work, I'm doing fitter's work, so he gets a withdrawal card from the union.  Just assume with   me that that's what happened.  Okay?

A.      Okay.

Q.      And then let's also assume that after he did that, then this Comstock fellow… finds that he's still doing sheet metal work after he said he wasn't going to do it.  Okay?

A.      Okay.

Q.      Is that what the triggering event is, getting caught doing the work that you claim you weren't going to do anymore?

A.       That can be part of it.  That's part of it.

Q.     Was that part of it in his case?

A.     Yes.

Q.     And when Comstock writes the letter, and you can look at it again, isn't he basically saying that he thinks he caught Hawley doing something that wasn't just the steamfitter work but he was actually doing sheet metal work.

MR. [RIFKIND]:  Objection.  You can answer.

A.     From what I can remember in reading the letter, that's how it appeared.

Q.     So what you're saying is that's part of why Hawley had the Exit Contribution imposed against him.

A.     Yes. *Id. pp.41-45*

When asked specifically about the Article VI language suggesting that Exit Contributions are designed to cover additional costs incurred by the Fund as a result of a triggering event, Dyer said he did not know whether the concept of calculation of what specific additional costs would have been to the Fund had anything to do with the amount of Exit Contribution liability assessed. *Id. p.24.*  Dyer does not know even what the additional costs are that Plaintiff incurs by triggering events in general.  *Id. p.52.*  Nor  does he know what additional costs Plaintiff incurred that were specifically tied to the triggering event for Defendant.  *Id. pp.52-53.*

## **ARGUMENT**

### Summary Judgment Principles

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  F.R.C.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The summary judgment record includes the pleadings, depositions and admissions on file, together with any affidavits.  *Cellotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986).   The court has an "affirmative obligation to… prevent factually unsupported claims… from proceeding to trial." *Felty v. Graves-Humphries Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).  The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations in his pleadings but must set forth specific facts that show that there is a genuine issue for trial." *Allstate Financial Corp. v. Financorp, Inc.*, 934 F.2d 55, 58 (4th Cir. 1991).   The mere existence of some alleged factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

<u>There is no Basis in ERISA or the Record to Impose an Exit Contribution on Defendant</u>

The Fund acknowledges that Defendant incurred no statutory withdrawal liability but claims entitlement to an Exit Contribution from him anyway.   The concept of "Exit Contributions" is created from whole cloth by Plaintiff to apply when the statutorily-imposed concept of withdrawal liability produces none and is altogether inconsistent with ERISA.  In fact, to even call such sanctions an Exit "Contribution" is a clever misnomer.  These amounts are not really contributions under ERISA at all.   Defendant's obligation to make regular monthly contributions was based upon hours worked and stopped when Defendant's work under a CBA ceased.  Plaintiff is trying to characterize its claim as a "contribution" to fit within the terms of ERISA. This Court should examine fully the real nature of the amount Plaintiff seeks to impose upon Defendant and look past such transparent characterizations.

A distinction between a contractual liability for withdrawing and ERISA liability was noted in *Trustees of Graphic Communications International Union Upper Mid-West Local 1M Health & Welfare Plan v. Bjorkedal*, 516 F.3d 719 (8th Cir. 2008).  In that case, a welfare plan sought to impose a "withdrawal contribution" based on the employer's withdrawal from the

fund.  While not actually approving whether such contract liability could be imposed upon the employer in that case, but only addressing whether its officers could be reached and holding no, the appeals court stated:

> The trustees characterize their action as involving two types of payments: Contractual obligations based on premiums owed but not paid to the Fund, and withdrawal liability, which arose when [the employer] withdrew from the Fund and became obligated to cover the cost of health benefit premiums for retirees for a period of five years.  This is something of a mischaracterization.  The withdrawal liability at issue is wholly contractual in nature.  *Id. at 725.*

Just as in *Bjorkedal*, the amount sought by Plaintiff is purely contractual in the sense the Fund simply wrote it into the "Trust Agreement."  Any award by this Court of such an amount would therefore result from an obligation under the "Trust Agreement" and would not be imposed under ERISA.  But the Fund should not be allowed to impose withdrawal liability contractually when it is not properly imposed by the comprehensive set of rules on that subject under ERISA.

Plaintiff claims to be bringing suit for Exit Contributions under ERISA Section 515 (29 U.S.C. § 1145), which states that "every <u>employer</u> who is obligated to make <u>contributions to a multi-employer plan</u> under the terms of the plan or <u>under the terms</u> of a collectively bargained agreement shall, to the extent <u>not inconsistent with law,</u> make such contributions in accordance with the terms and conditions of such plan or such agreement." Each highlighted portion of the statute provides a reason for entering judgment as a matter of law for Defendant.

Section 515 simply does not apply here.  It only addresses "contributions" required by the terms of the plan or collectively bargained agreement.  Here, Plaintiff's case depends entirely upon incorporating by reference Article VI of the "Trust Agreement" into the language of the CBAs.  As a matter of law, there was no incorporation; Plaintiff's case fails because there is no showing Defendant ever directly or indirectly promised to make an Exit Contribution to Plaintiff.

The principles governing this issue were discussed in the September 15, 2008 decision of Judge Cacheris in *Board of Trustees, Sheet Metal Workers' National Pension Fund v. DCI Signs & Awnings,* 1:08cv15.  There, Plaintiff and a party to a collective bargaining agreement argued over whether Exit Contribution liability could be assessed.  While denying both parties' motions for summary judgment, Judge Cacheris did state:  "The Court finds Defendant's argument persuasive regarding the failure of the CBA to incorporate the terms of the Trust Agreement by reference because the Trust Agreement document was not identified with sufficient specificity." (Memorandum Opinion p. 8).  Judge Cacheris noted that incorporation by reference requires an incorporated document be sufficiently named and easily identifiable.  *Id.  p.7.* (citing *Hertz v. Zurich American Insurance Co.*, 496 F.Supp.2d 668, 675-76 (E.D. Va.  2007)).  Reference to the secondary document must be clear and specific, and incorporation should "not result in surprise or hardship." *Hertz.*  Parties must therefore know of and assent to incorporated terms.

The undisputed facts and CBA language are discussed in paragraphs 7-9 of Defendant's Affidavit above.  Briefly summarizing, the CBA language that purports to incorporate certain agreements or trust declarations by reference simply does not meet the legal test for incorporation by reference.  The "Trust Agreement" does not qualify as an easily identifiable or readily ascertainable document incorporated into the CBAs.  Instead, surprise and hardship is caused by seeking to impose Exit Contribution liability upon Defendant in this case.  Defendant never even saw, let alone read or agreed to, Article VI of the "Trust Agreement." As a matter of law, he also did not agree to incorporate such verbiage into the CBAs in which he participated. The documents in question were all drafted either by Plaintiff or certainly someone other than Defendant.  This Court should conclude Defendant was not bound to the Exit Contribution language he never adopted.

The closest Plaintiff can come to incorporation language is the reference to the "Industry Fund of the United States." The document itself distinguishes between "IFUS" and the "Industry Fund of the United States."  The drafters distinguished those terms when "IFUS" was used in some places and "Industry Fund of the United States" was in others.  The language of the CBA does not specifically incorporate a "sufficiently named and easily identifiable" document. Article VI is part of the "Sheet Metal Workers' National Pension Fund Amended and Restated Agreement and Declaration of Trust as Amended through June 1, 2003." That document's name is not the same as any of the names set forth in Sections 12 and 14 of the CBA.  Plaintiff's case must fail because Defendant never agreed to the terms of Article VI of the "Trust Agreement," either directly (by signing) or indirectly by assenting (incorporation).

There is a second and perhaps more fundamental problem that Plaintiff faces.  As noted in the statute, an "employer" is not obligated to make "contributions" to the extent "inconsistent with law." Plaintiff's claim to an "Exit Contribution" that is dependent upon a finding of no statutory withdrawal liability is totally inconsistent with the concept of statutory withdrawal liability, the comprehensiveness of the statutory scheme concerning it and other provisions of ERISA.[1]

Permeating this case is the obvious point that Plaintiff urges Defendant is liable for an Exit Contribution because no statutory withdrawal liability was due.  Such "through the back door" logic, to in effect obtain money because of a withdrawal that does not produce statutory withdrawal liability, is completely improper.  Congress passed the Multi-Employer Pension Plan Amendments Act of 1980 that specifically added Section 515 and all of the withdrawal liability

---

[1] While Judge Cacheris ruled in *DCI Signs* that there is no bar to exit contribution liability, the detailed arguments set forth herein were not presented to him in that case.  When the entirety of Defendant's argument is considered, Defendant believes this Court should rule contrary to Judge Cacheris' result, noting that doing so would be based upon contentions he never had presented to him.

provisions.   The legislation was lengthy, and its comprehensive provisions obviously show Congress intended to totally occupy the field governing required monetary payments when an employer "withdraws." The choice was to impose statutory withdrawal liability.  A review of the statutory scheme shows this.   Nowhere is contractual "exit contribution" liability beyond the carefully-crafted statutory withdrawal liability permitted.

Turning first to ERISA Section 4201(a) (29 U.S.C. § 1381(a)), an employer that withdraws from a multi-employer plan in a complete withdrawal is liable to the plan for the amount to be determined under Subsection (b) of that section.   That subsection first commands that withdrawal liability be determined under ERISA Section 4211 (29 U.S.C. § 1391), to calculate the allocable amount of unfunded vested benefits.   Then, the law requires that amount be adjusted:

(A)     first, by any de minimis reduction applicable under Section 1389 of this
        title,
(C)     then, to the extent necessary to reflect the limitation on annual payments
        under Section 1399(c)(1)(B) of this title; and
(D)     finally, in accordance with Section 1405 of this title.

Sub-subsections (A), (C) and (D) each detail comprehensive limitations on withdrawal liability.[2] A review of Section 4201 and each of the statutory sections to which reference is made therein does not give a shred of support to the notion of permitting non-statutory withdrawal liability.

The entire concept of Exit Contribution liability depends upon the plan determining that no statutory withdrawal liability is owed.   Plaintiff is trying to change or at least condition the withdrawal liability permitted under the statute.   Doing so is directly contrary to ERISA Section 4224 (29 U.S.C. § 1404), which only permits multi-employer plans to adopt rules for other terms

---

[2] Defendant will not unduly lengthen this memorandum by quoting all of the various provisions cited and others concerning withdrawal liability.  Even a cursory review of the various sections establishes that statutory withdrawal liability is a comprehensive creation and that Congress carefully created a well-developed scheme for determining statutory liability for withdrawing employers.

and conditions of an employer's withdrawal liability if such rules are consistent with ERISA. As ERISA and the MPPAA do not provide for liability beyond statutory withdrawal liability, Plaintiff's suit is therefore precluded by Section 4224.

Plaintiff's claim is also completely inconsistent with ERISA Section 4301 (29 U.S.C. § 1451(b)). That section specifically states that, in an action to compel an employer to pay withdrawal liability, the failure of the employer to make payment shall be treated as a delinquent contribution under ERISA Section 515 (29 U.S.C. § 1145). Congress obviously thought it needed to specify that statutory withdrawal liability is covered by Section 515. It never said so for non-statutory withdrawal liability. This strongly suggests that Section 515 is limited to suits to recover regular delinquent contributions for periodic monthly payments not made by employers. Congress said nothing about exit-type contributions, yet it thought it needed to specifically say withdrawal liability was covered. The combination shows that Section 515 does not permit non-statutory withdrawal liability.

One of the basic concepts of ERISA withdrawal liability is mandatory arbitration. The detailed provisions are set out in ERISA Section 4221 (29 U.S.C. § 1401). Employers who object to withdrawal liability claims must initiate arbitration timely, and special rules are provided by the statute governing such matters. Congress did not prefer a litigation forum to involve plans in disputed court cases over withdrawal liability. Instead, Congress limited employers to an arbitral forum for determining what, if any, amount of statutory withdrawal liability was to be imposed upon a withdrawing employer. It is completely inconsistent with the carefully-adopted scheme involving arbitration of statutory withdrawal liability to permit an employer to be forced to pay an automatic amount of three years of previous contributions as Plaintiff seeks here and litigate such dispute.

Section 204(g) (29 U.S.C. § 1054(g)) provides that the "accrued benefit of a participant under a plan may not be decreased by an amendment of the plan… ." Section 12.01 of the Plan Document specifically reinforces the statute and commands that no termination of an employer (which would include withdrawals under Section 12.04) may result in an impermissible reduction of accrued benefit under Section 204 of ERISA, 29 U.S.C § 1054. In the case at bar, Plaintiff has sued a "one man shop." It is undisputed that Defendant has never had employees. Instead, this case amounts to Plaintiff pursuing Defendant, who made a little over four years of monthly contributions, for re-payment of three years worth of contributions. The upshot of this entire case is that Plaintiff seeks to hold Defendant personally liable for an Exit Contribution which has the unmistakable, direct affect of reducing his accrued benefit under the Fund.

Defendant expects Plaintiff to cite Judge Cacheris' March 5, 2008 unappealed order denying DCI Signs' motion to dismiss in that case. Defendant respectfully urges this Court to distinguish or deviate from that ruling. First, as stated, Judge Cacheris did not have the arguments cited above presented to him. Second, he noted that ERISA mandates pension benefits not be reduced but recognized plan sponsors can modify welfare plans. Judge Cacheris utilized this distinction to state that "ERISA does not prohibit employers from agreeing, if they choose, to increase obligations beyond the statutory floor," meaning contractual withdrawal liability as a concept is valid. The case at bar involves a pension plan, however. The reduction in Defendant's accrued <u>pension</u> benefit wrought by the Exit Contribution Plaintiff wants to impose is a key difference from an entity's ability to modify a welfare plan benefit.

Judge Cacheris also did not consider (probably because the argument was not presented to him), that the preemption provisions of ERISA Section 514 (29 U.S.C. § 1144) apply. Judge Cacheris' underlying rationale is that state contract law permits parties to agree upon rights,

obligations and remedies in addition to what ERISA imposes. However, Section 514 states that all such laws and claims are superseded as they relate to employee benefit plans, by subchapters I and III of ERISA. See *Aliff v. BP America, Inc.*, 26 F.3d 486, 489 (4th Cir. 1994). Subchapter III includes all of the provisions regarding employer withdrawals starting with 29 U.S.C. § 1381 and including the other sections noted in this Memorandum. Under the circumstances, Judge Cacheris' "one can contract for more than ERISA permits" rationale is preempted.

Recovery also cannot be obtained under Section 515 unless the defendant is an "employer" when the "contribution" is sought. As shown in paragraphs 10, 11 and 17 of Defendant's Affidavit, he was no longer an "employer" at the time any Exit Contribution liability was first assessed via Dyer's February 4, 2008 letter. Defendant was not subject to the requirement of making periodic contributions at that time. Section 515 applies to "contributions" in the plural, whereas Article VI seeks to impose a single Exit Contribution. This statute does not include liability for anyone owing a single contribution. Moreover, his withdrawal from Local 1 qualified under Article 12 of the Plan Document to terminate his status as an employer. Since Defendant made the complete withdrawal Plaintiff itself recognizes occurred on or about October 1, 2008, Plaintiff cannot establish, on the undisputed record, that Defendant was an "employer" when Exit Contribution liability was established.

<u>Even if Exit Contribution Liability is Allowed under ERISA and Part of the CBAs and Trust Agreement, Plaintiff is Seeking a Penalty Unenforceable Under State and Federal Law.</u>

In Virginia, parties to an agreement may draft a liquidated damages clause that entitles the plaintiff to stipulated damages. However, such provisions are only "enforceable when the actual damages contemplated at the time of the contract are not certain and are difficult to measure with accuracy and when the fixed amount of damages is not out of all proportion to the probable loss." *Perez v. Capital One Bank,* 258 Va. 612, 616 (1999). Should a court find

otherwise, the provision is deemed a penalty and therefore unenforceable.   Under federal common law, *Allis-Chalmers v. Lueck*, 471 U.S. 202, 209 (1985), instructs courts to follow basic governing rules.   The same standard for liquidated damages would then apply.   Stipulated damages are generally enforced if damages are indeterminable at the time of contracting and the amount agreed upon is not unconscionable, an illegal penalty and not otherwise violative of public policy.   Williston on Contracts § 65:1.   A liquidated damages provision violates public policy when it is intended to punish a party or seeks to coerce performance of the underlying agreement by penalizing non-performance.   *Bakery & Confectionary Union & Industry International Pension Fund v. Ralph's Grocery Co.,* 118 F.3d 1018, 1021-22 (4th Cir. 1997).

Plaintiff's claim fails as a matter of law on the undisputed facts because:  (1) Plaintiff really suffered no damages or loss to be "liquidated" because Defendant paid all regular monthly contributions found due in the last audit plus fees, and no withdrawal liability was found due from him; (2) Plaintiff's "damages" if any caused by a withdrawal that produced no withdrawal liability are not difficult to measure; (3) the amount claimed here is out of all proportion to Plaintiff's "loss," which is non-existent or at best miniscule and ministerial; and (4) Plaintiff is obviously using erroneous information to punish Defendant for withdrawing from the sheet metal union under a mistaken belief that he performed covered work after withdrawing.

The Fund concedes that Defendant has no withdrawal liability.   He also paid up all regular monthly contributions and audit fees claimed of him and therefore owes nothing at all to Plaintiff for the two basic forms of relief funds can and normally do seek:  periodic contributions based on hours worked and statutory withdrawal liability.   Yet the Fund essentially seeks to impose a different kind of withdrawal liability through the concept of Exit Contribution, claiming it as "liquidated" damages for Defendant's withdrawal.   Under ERISA, however,

Defendant's withdrawal resulted in a finding that he had zero liability and caused no damages in that sense.  Because the Fund actually suffered no damages, the Exit Contribution is a grossly disproportionate measure and can only be classified as a penalty.

Dyer's deposition testimony and the Exit Contribution language in the Trust Agreement upon which Plaintiff relies confirm the intent is to cover additional costs incurred by Plaintiff as a result of a triggering event.  But by Dyer's admission, the idea of what these costs amount to has nothing to do with the assessment of Exit Contribution liability.  Instead, the Fund simply goes back and demands three years of contributions made by someone in Defendant's position.  When given the opportunity to testify about costs to the plan of withdrawals in general or as to Defendant particularly, Dyer had no way of connecting the act of withdrawal to any specific or even general cost to the Fund.  Dyer knew nothing about what additional costs Plaintiff incurs for withdrawals for "triggering events," either as to all employers or specifically as to Defendant.  While the language cited suggests that Plaintiff is trying to recoup costs associated with withdrawals, the undisputed testimony is that this is not actually the case.  The Exit Contribution being sought therefore does not address actual damages that are not certain or are difficult to measure with accuracy.  Instead, the amount of three years of contributions is pulled out of the air and is out of all proportion to the probable loss, which is either none or negligible.

In this case in particular, there is no showing of cost to the plan incurred because Defendant withdrew from Local 1.  Plaintiff had done a compliance audit at the end of the period of time when Defendant was bound to a CBA.  He paid the amount due plus the audit fees and other costs.  The amount due and paid was not caused by Defendant's withdrawal anyway; it related to periodic contributions due for an earlier time.  There was therefore no additional cost to Plaintiff associated with this aspect of Defendant's withdrawal.  Simply closing down

whatever file Plaintiff maintained for Defendant was no more than a minimal, clerical task of no great cost to Plaintiff. The only other inquiry was to determine whether Defendant owed statutory withdrawal liability. This simply involved writing a letter to Defendant asking him to complete the Fund Questionnaire, reviewing that document when returned and determining that no or de minimis withdrawal liability was owed. Clearly the sum total of all possible work by Plaintiff at the conclusion of Defendant's participation with Local 1 is out of all proportion to the $27,485.60 determined to be due as an Exit Contribution.

The provision in this case can only be enforced if Plaintiff's damages, loss or expenses from the withdrawal would be difficult to measure with accuracy when initially contemplated. Here, Plaintiff claims it has had the Exit Contribution liability concept in place since 2003. However, they clearly sought regular monthly contribution and withdrawal liability before amending their Trust Agreement. Certainly at the time Defendant joined Local 1, Plaintiff knew what it would cost to calculate withdrawal liability if any for a "one-man shop" and close the file if none was found due. Therefore, not only is the amount claimed totally out of proportion to the "probable loss," Plaintiff's "actual costs of withdrawal" are not so uncertain and difficult to measure as to avoid a finding of unenforceable penalty. Pursuing such an unenforceable penalty also violates 29 U.S.C. § 1104(a)(1) because Plaintiff "is comprised of individual trustees who are 'fiduciaries' with respect to the Fund" (JSUF ¶ 3), and they may only act to defray "reasonable expenses of administering the plan." Here, Plaintiffs are seeking a totally unreasonable amount bearing no relation whatsoever to "reasonable" expenses regarding Defendant's withdrawal.

As a matter of law, the undisputed facts show Plaintiff is assessing an unenforceable penalty upon Defendant. There is no question but that Plaintiff either intended to punish

Defendant for withdrawing from Sheet Metal Worker's Local Union 1 and then doing work covered by the sheet metal CBA or it sought to coerce performance by penalizing non-performance.   The entire scenario, involving the McDonald's job, Balzell's similar sounding business name, the misimpressions of Comstock and the fact that it was either the reason or a necessary part of the rationale for imposing Exit Contributions in this case, establishes Plaintiff is seeking an unenforceable penalty.   The above facts show that Defendant did not perform covered sheet metal work at the McDonald's site or for that matter at any site after withdrawing from Local 1.   Nevertheless, Comstock provided inaccurate information about Defendant's extremely limited fitter work on that one site.   Dyer admitted to Defendant that the only reason the February 4, 2009 letter demanding Exit Contributions was written was because of what Comstock had written in his January 10, 2009 letter to the Fund.   Dyer even told Defendant the Exit Contribution matter would be dropped if the Local Business Agent (Comstock) would write a letter clearing up the miscommunication about which "Hawley" had the contract with Prairie Contractors.

These facts stand undisputed in the record because Dyer cannot even recall whether he had a conversation with Defendant.   Testimony saying one does not recollect an event, rather than denying it occurred, does not create an issue of fact regarding what the opposing party testifies actually happened.   Dyer's deposition testimony establishes that the entire affair involving Comstock's letter and the claim, all be it erroneous, that Defendant was performing covered sheet metal work after withdrawing from the sheet metal union was the reason or at least one of the necessary reasons for Exit Contribution liability being imposed upon Defendant.   As a matter of law, the facts establish that the amount claimed is unconscionable, an illegal penalty and violates public policy.   It was intended to improperly punish Defendant for allegedly

withdrawing from the sheet metal union (thereby promising not to do covered sheet metal work in that jurisdiction) and then performing a covered job (even though he did not) in contradiction to the withdrawal from the union and the implied promise to not do covered work anymore.

In *DCI Signs*, Judge Cacheris upheld the notion that this Plaintiffs' exit liability claims can be defended by asserting the doctrine of unenforceable penalty.  He did not resolve that case on summary judgment because the parties "did not provide facts regarding whether plaintiffs' actual damages were difficult to measure or whether the amount of the Exit Contribution assessed on defendant was unconscionable." Memorandum Opinion p.16.  The case at bar is appropriate for summary judgment on the unenforceable penalty issue for the foregoing reasons. The undisputed facts show Plaintiffs' loss is essentially nil and its actual costs of determining withdrawal liability and closing Defendant's file would not have been difficult to measure.  The amount assessed was unconscionable under all of the undisputed facts.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment must be granted.

Dated: February 19, 2010            _____/s/_____

Emily H. Smith
VA Bar No. 65527
Attorney For Defendant
Stites & Harbison PLLC
1199 N. Fairfax Street, Suite 900
Alexandria, Virginia 22314
Phone: (703) 837-3928
Fax: (703) 518-2958
ehsmith@stites.com

Jeffrey A. Ryva (PHV)
Husch Blackwell Sanders LLP
401 Main Street, Suite 1400
Peoria, Illinois  61602-1241
Telephone:  (309) 637-4900
Facsimile:   (309) 637-4928
jeff.ryva@huschblackwell.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of February, 2010, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

> Sarah G. Naji VA Bar No. 72966
> Attorney for Plaintiff Slevin & Hart, P.C.
> 1625 Massachusetts Avenue, Suite 450
> Washington, DC 20036
> Phone: (202) 797-8700
> Fax: (202) 234-8234
> snaji@slevinhart.com


> _____/s/_____
> Emily H. Smith
> VA Bar No. 65527
> Attorney for Defendant
> Stites & Harbison PLLC
> 1199 N. Fairfax Street, Suite 900
> Alexandria, Virginia 22314
> Phone: (703) 837-3928
> Fax: (703) 518-2958
> ehsmith@stites.com
>
> Jeffrey A. Ryva (PHV)
> Husch Blackwell Sanders LLP
> 401 Main Street, Suite 1400
> Peoria, Illinois  61602-1241
> Telephone:  (309) 637-4900
> Facsimile:   (309) 637-4928
> jeff.ryva@huschblackwell.com